IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

CHRISTIAN D.,[1]

      Plaintiff,

                            **Civil Action 2:21-cv-4021**
   v.                        **Judge Michael H. Watson**
                            **Magistrate Judge Elizabeth P. Deavers**

COMMISSIONER OF
SOCIAL SECURITY,

      Defendant.

## REPORT AND RECOMMENDATION

Plaintiff, Christian D., brings this action under 42 U.S.C. § 405(g) for review of the most recent decision of the Commissioner of Social Security ("Commissioner") denying his application for Social Security Supplemental Security Income benefits ("SSI"). Pending before the Court is Plaintiff's Statement of Errors (ECF No. 11), the Commissioner's Memorandum in Opposition, (ECF No. 16), and the administrative record (ECF No. 6). Plaintiff did not file a Reply. For the reasons that follow, the Undersigned **RECOMMENDS** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's non-disability decision.

## I. BACKGROUND

This is Plaintiff's third case before this Court concerning the Administration's denial of his application. *See* [*Christian D.*] *v. Comm'r of Soc. Sec.*, S.D. Ohio Case. No. 2:14-cv-1909 (the "2014 Case"); [*Christian D.*] *v. Comm'r of Soc. Sec.*, S.D. Ohio Case No. 2:17-cv-995 (the

---

[1] Pursuant to General Order 22-01, due to significant privacy concerns in social security cases, any opinion, order, judgment or other disposition in social security cases in the Southern District of Ohio shall refer to plaintiffs only by their first names and last initials.

"2017 Case"). Previously, an application for SSI was filed on Plaintiff's behalf when he was a minor on August 30, 2011, alleging disability beginning April 1, 2011, due to low motor skills, mental problems, fibromyalgia and being learning challenged. (R. at 152-157, 236.) Plaintiff's application was denied initially in November 2011, and upon reconsideration in February 2012. (R. at 57-85.) On January 11, 2013, Plaintiff, who was represented by counsel, appeared and testified at a video hearing held by an administrative law judge. (R. at 32-56.) On May 16, 2013, James B. Griffith ("ALJ Griffith") issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 10-31.) The Appeals Council denied Plaintiff's request for review, and he filed a case before this Court. *See* 2014 Case. This Court remanded the matter for further proceedings. (R. at 1553-1566.)

On remand, the claim was assigned to administrative law judge Edmund E. Giorgione, and then to Timothy Gates ("ALJ Gates"). After two hearings, ALJ Gates concluded Plaintiff was not eligible for benefits because he was not under a "disability" as defined in the Social Security Act – for both from the time before January 27, 2014 (for Plaintiff's childhood disability claim) and since January 27, 2014, when Plaintiff turned 18 years old (for Plaintiff's adulthood disability claim). (R. at 1435-1523.) After the Appeals Council denied Plaintiff's request for review, Plaintiff filed the 2017 Case, resulting in an Order affirming in part and reversing in part the Commissioner's non-disability finding and remanding the case for further administrative proceedings consistent with the Court's opinion. (R. at 1281-1286, 2238-2247.) Specifically, the Court affirmed the Commissioner's non-disability finding under the ***childhood*** standard of disability, but found that the ALJ failed to provide good reasons for rejecting Plaintiff's treating physician's opinion regarding Plaintiff's ***adult*** disability claim. *See* [*Christian D.*] *v. Comm'r of Soc. Sec.*, No. 2:17-CV-995, 2020 WL 1305030, at *6 (S.D. Ohio Mar. 19, 2020).

After the Court remanded the 2017 Case, Plaintiff's claims were then assigned to administrative law judge Noceeba Southern ("ALJ Southern"). After another hearing via telephone on March 25, 2021, ALJ Southern determined that Plaintiff was not eligible for benefits as he was not under a "disability" as defined in the Social Security Act. (*See* R. at 2162-2229.) Plaintiff then timely commenced the instant action. (ECF No. 1.)

## II.  HEARING TESTIMONY

ALJ Southern summarized Plaintiff's statements to the agency and the relevant hearing testimony as follows:

> In August 2011, [Plaintiff's] mother . . . reported that [Plaintiff] had low motor skills, mental problems, fibromyalgia, and learning difficulty. She elsewhere reported that [Plaintiff] did not have problems seeing, hearing, talking clearly, or communicating but had limitations with respect to engaging in daily activities, understanding and using what he had learned, performing physical activities, taking care of his personal needs and safety, paying attention, and sticking with a task. In October 2011, on a function report completed by [Plaintiff's] mother on his behalf, it was reported that [Plaintiff] had chronic pain due to fibromyalgia and was depressed. It was reported that he had limited mobility in his upper and lower extremities, that he was wheelchair bound, that he required assistance getting dressed, and that he had many accommodations when attending school. On a disability appeals report, it was reported that he started using a wheelchair in September 2011.

> At a January 2013 ALJ hearing, [Plaintiff] testified that he was unable to go to school due to pain and migraines. He said that he spent his day lying in bed staring at the ceiling all day for the past two to three years. [Plaintiff's mother] testified that [Plaintiff] did not have any strength and had swollen legs.

> In December 2015, [Plaintiff] completed and signed his own development questionnaire and reported that he earned a regular high school diploma. He alleged extreme limitations due to pain and swelling throughout his body.

> At the February 2016 hearing, [Plaintiff] testified that he had been under an Individualized Education Program (IEP) and had to attend summer school because of bad grades, but he was performing at the 12th grade level when he graduated. He said that he had gotten along with only one teacher and very few classmates because of his poor attendance due to his medical condition. He said that he had had a great relationship with his grandparents but that he had spiraled into depression after they passed away.

3

\*\*\*

At the August 2016 hearing, [Plaintiff] testified that his condition had worsened since the February 2016 hearing and that his dosage of medication had been increased. He said that he had back pain, constant migraine headaches, and difficulty getting up. He said that he received infusions once a week to reduce pain and inflammation and that it was a five-hour process and sometimes caused a spike in blood pressure. He said that he had nausea afterward and required his mother's assistance to get up the stairs. He said that he remained in bed for four days after the infusions, that they resulted in more intense migraines, and that he received very little benefit from them. He said that his vision out of his left eye had worsened and that he had an eye droop and blurred vision when fatigued. He said that he continued to have light sensitivity. He initially indicated that transitional lenses and sunglasses did not help but then indicated that they were of some help. He said that he kept the light dimmed at home. He said that his musculoskeletal complaints were aggravated by rain. He said that he had been a passenger in an April 2016 motor vehicle accident and suffered a concussion. He said that his head was swollen for a month afterward and that he had fainting spells. He said that he stayed in bed most of the day and had difficulty with bathing, showering, and toileting.

At the most recent hearing on March 25, 2021, [Plaintiff] testified he has chronic pain throughout his body and significant back pain. He has difficulty sitting or standing for long periods of time. He has significant stiffness, and his joints (shoulders, hips, ankles, or lower back) tend to "lock up" on him. He has difficulty using stairs, particularly going up, or ambulating on uneven ground. He gets fatigued and has pain when trying to use the stairs. Extreme weather will affect his joints as well. He will elevate his legs most of the day to help with his pain. He has difficulty reaching overhead. He has no problem reaching in front of himself, but reaching out to the sides is "a little" more difficult. He has difficulty lifting heavy objects. He has trouble with repeated hand motions and he cannot write a full[-]page letter using a pen or pencil. Sometimes he has to use a cane when standing and needs to shift his weight from side to side. He can stand for about 5-10 minutes until needing to sit for about 20-30 minutes before getting back on his feet. He can sit for roughly 30 minutes before needing to stand for about 10 minutes due to the pain and then sit down again. He testified that he has migraine headaches daily, which are of a moderate to severe level. His migraines last 4-5 hours at a time, but usually longer than that. Sleep is the only thing that helps the migraines. Mentally, he has issues with depression. He has problems with memory and attention. He does not like to be in large crowds. His energy level is very low. He has difficulty sleeping at night and will sleep four hours at most. He does not nap during the day. He has 4-5 days out of a week where he cannot get anything done.

As for activities of daily living, he testified that he lives in a house with his mother. He reported he was 6'1" tall and weighed 214 pounds at the time of the hearing. In a typical day, he will get up in the early afternoon and take the dogs out. He will lie down most of the rest of the day and maybe have some food from the kitchen. He

can do very simple chores like cleaning countertops. He does not cook. He does not have a driver's license.

(R. at 2173-2174, 2191-2192 (internal citations omitted).)

## III. MEDICAL RECORDS AND OPINIONS

ALJ Southern summarized Plaintiff's medical records and symptoms related to his

physical impairments prior to attaining age 18 as follows:

> In terms of [Plaintiff's] alleged pain and headaches, he was diagnosed with fibromyalgia in 2009 when he developed progressive pain following a motor vehicle accident. In October 2010, he presented with abdominal pain, vomiting, and fever, but a physical examination revealed that he was in no distress and had normal musculoskeletal range of motion. He moved all extremities without difficulty. In April 2011, he presented with a generalized complaint of pain all over his body at an alleged intensity level of 10 on a 10-point scale, but an examination revealed that he was in no acute distress and had normal muscle strength with no atrophy or swelling of the joints, though he had 18 out of 18 fibromyalgia tender points. In May 2011, he was in pain but not in acute distress and he had normal muscle strength with no atrophy, though he had 10 out of 18 fibromyalgia tender points. He had no swelling, limitation of motion of his joints, or limp in his gait. Sacroiliac x-rays revealed only mild symmetric bilateral sclerosis of the iliac bones, possibly due to early ankylosing spondylitis or reactive arthritis. In June 2011, he reported foot pain at an intensity level of 10, but he was in no acute distress and had no gross motor or sensory deficits. Later in June 2011, he reported generalized body pain in his joints and muscles, as well as headaches, and he alleged an average pain level of 8, but a physical examination revealed that he was in only mild distress and had full range of motion of his extremities, though he had a gait that was painful to bear weight. In July 2011, he was in pain but no acute distress and he had normal strength with no atrophy and no swelling or limitation of motion of his joints, though he had 14 of 18 fibromyalgia tender points. He reported performing home exercises. In August and September 2011, he was in only mild distress and had full range of motion of his extremities, though he had tender points and painful weight bearing.

> In October 2011, [Plaintiff] began a three-week intensive pediatric pain rehabilitation program that significantly improved his condition. After the first day, he was able to transition from a wheelchair to a walker. By the third day, he was ambulating without the walker. Over the course of the program, he improved his gait pattern and reported that his body "doesn't feel like it[']s on fire anymore[.]" Additionally, he was able to walk a mile, dress himself without assistance, and bend over to tie his shoes. He also had significant improvement in his fine motor skills and was able to draw, paint, button, zip and open containers without difficulty. He still experienced fatigue with typing for prolonged periods, but this was determined not severe enough to warrant additional treatment.

5

Following his rehabilitation program, [Plaintiff] was weaned off his medication, which strongly suggests that his pain had improved. In December 2011, he reported walking without assistance and participating in a daily exercise program. Treatment records from April 2012 document that his fibromyalgia was doing better and exercise was encouraged. He was also encouraged to attend school daily. In June 2012, he reported no change in his pain level, despite not being on medication, and he indicated that his fibromyalgia "fog" was gone.  Based on these reports, he was to remain off medication. An August 2012 physical examination revealed a normal gait, heel and toe walk, and tandem walk. In September 2012, he was described as alert and active, and he had normal physical examination findings, except for multiple tender points.

The above evidence demonstrates that [Plaintiff's] fibromyalgia improved since the rehabilitation program. Educational records revealed that he was no longer limited in his access to education and was able to walk and use the stairs at school. He was also able to attend school four days per week and was encouraged to attend daily. Treatment records indicate that he was no longer taking medication, which contrasts with his claim of disabling pain due to fibromyalgia. He was followed by a neurologist and took medication for his headaches. It is also worth noting that he had not had any inpatient hospitalizations for pain or headaches. At the January 2013 hearing, he testified that he had spent his whole day lying in bed for the past two to three years, which contradicts treatment records stating he attended school four days per week. In addition, prolonged bed rest typically results in muscular atrophy, which has not been noted by any treating source. Moreover, he did not express any overt pain symptoms, and ALJ Griffith noted in the remanded decision that [Plaintiff] did not appear to have difficulty sitting through the January 2013 hearing. Similarly, Dr. Kramer noted that [Plaintiff] did not seem in any particular pain and expressed his doubts about whether his impairments were as significant as he and his family portrayed.

In January 2013, [Plaintiff's] mother reportedly wanted to enroll him in an Art Explorer Post Program. A February 2013 MRI of his pelvis revealed only mild bilateral erosive changes and pre-contrast signal abnormalities of the lumbosacral joints. An MRI of his lumbosacral spine revealed substantially unremarkable findings, except for only subtle interspinous ligament enhancement with no involvement of the fact joints. Despite his pain complaints, January and April 2013 physical examinations revealed that he was in no distress and moved all four extremities well. In May 2013, he had normal strength and balance and no limp, though he had some tenderness and diminished range of motion. In June 2013, he reported significant joint and muscle pain but was in no distress. In August 2013, he was in only mild musculoskeletal distress and moved all four extremities well. In October 2013, he reported continued pain and tiredness, but he was in no distress and had no swelling or limited range of motion of his joints. In December 2013, he was in no distress and moved all four extremities well, though he continued to have synovial proliferation and mild pain with flexion of his knees. He was described as alert and active.

6

(R. at 2174-2176 (internal citations omitted).)

ALJ Southern summarized Plaintiff's medical records and symptoms related to his

physical impairments since turning age 18 as follows:

> With respect to his physical condition, the record does not document the intensity
> and frequency of symptoms and limitations that [Plaintiff] alleged since he reached
> age 18. Rather, in February and August 2014, and January 2015, he reported pain
> complaints and headaches, but he was in no distress and he moved all four
> extremities well, though he reportedly had tender knees and painful hips. His lungs
> were clear. Review of systems consistently revealed no joint limitations, limping,
> lung problems, or rheumatic signs or symptoms. In August 2014, he reported that
> he had graduated from high school and was overall better. In January 2015, he
> reported that he had been better the past 18 months while on Orencia. In February
> 2015, he reported not taking any medications at that time. In April 2015, he reported
> that he felt better after receiving three Actemra infusions, though he still had back
> and knee pain. He had normal muscle strength with no atrophy. A review of systems
> was negative for shortness of breath, though positive for fatigue, pain, and
> headaches. He was well developed and well nourished, and in no acute distress. He
> was described as the primary caregiver for his grandfather, who passed away in the
> past month, and he reported difficulty finding work since his death, which suggests
> that he was actively seeking work. Dr. Spencer stressed the importance of wearing
> glasses, as their absence could exacerbate headaches.
>
> In September and November 2015, [Plaintiff] had tenderness and limited motion of
> joints, but he had no atrophy and normal sensation and strength, and he was in no
> acute distress. His lungs were clear to auscultation with normal aeration and no
> retractions. In October 2015, he received injections to his hips, knees, and ankles.
> In November 2015, he reported that his arthritis was slightly better. A December
> 2015 examination revealed good vision with no findings to explain his alleged
> visual disturbance.
>
> In January 2016, [Plaintiff] reported doing badly with significant pain complaints,
> resulting in him staying in bed all day, but he was in no acute distress and had
> normal physical examination findings, except for some joint tenderness and limited
> range of motion, though he had normal musculoskeletal strength with no atrophy.
> He was prescribed intravenous Solumedrol and Methotrexate for eight weeks, as
> well as Actemra. At the February 2016 hearing, he testified that he lived in a house
> with stairs. He said that he worked for one and one-half months in 2014 for a car
> wash but he said that he had to quit due to his medical condition. He said that he
> could dress himself but that it took time. He said that he could shower or bathe
> himself but sometimes required help getting in and out of the shower. He said that
> he had been a caregiver to his grandfather, who passed away in March 2015, but he
> said that he struggled to provide care and often had to call his mother from work to
> help. In March 2016, he was in no acute distress and had normal physical

examination findings, except for some joint tenderness and limited range of motion, though he had normal musculoskeletal strength and sensation with no limp. In May 2016, he reported that he had been in a motor vehicle accident and had increased pain, but he was in no acute distress and had normal sensation with no atrophy, though he continued to have joint tenderness and limited range of motion. He testified that he was told to ice his head after the accident and had a swollen head for about a month, but had been in the hospital for just a day. Methotrexate, Actemra, and methylprednisolone injections began in May 2016 in treatment of polyarticular juvenile rheumatoid arthritis. June 2016 x-rays of his lumbar spine, pelvis, and hips revealed normal findings. An MRI of the pelvis in June 2016 showed only mild SI erosive changes. A July 2016 treatment note confirmed continued injections of Solumedrol, Methotrexate, and Actemra.

Later in 2016, he continued to have ankylosing spondylitis, but juvenile idiopathic arthritis had resolved. He reported having chronic daily headaches with rare headache-free intervals. His headaches were associated with nausea, dizziness, osmophobia, photophobia, and phonophobia. He had pain with head movement and had missed many school days due to the condition. It was felt that his headaches reflected a component of medication overuse. He went to physical therapy in 2016. He felt that he was moderately impaired functionally due to his pain and headaches. He indicated that he was able to perform household chores such as mopping and vacuuming daily, but that he had increased pain with prolonged standing. He also reported some temporary improvement in his pain after therapy sessions, and reported that he was able to walk his dog around the block. X-rays of the cervical spine in October 2016 were also unremarkable. He then reported an episode where he passed out going up the stairs in October 2016.

Upon examination in December 2016, [Plaintiff's] eye movement was normal and he had mild left ptosis. Strength, sensation, and gait were all normal. In May 2017, he reported some continued bodily pain, joint pain, and muscle pain, with morning stiffness. He was taking methotrexate regularly and continued to receive Actemra infusions monthly. He still reported daily headaches, and he was trying to limit analgesics, but continued to take about one Midrin a day. He reported that he did have some joint pain when doing some activities such as waiting for the bus, but that he was determined to either get another job or start taking college classes in spite of his pain. Upon examination in May 2017, [Plaintiff] had normal strength, no tenderness, and no atrophy. His hips were tender and limited in range of motion bilaterally. His lumbar spine had limited range of motion. His joints were otherwise unremarkable. His gait was normal. He was directed to stop methotrexate and Actemra as ineffective, and was placed on Cosentyx and Cymbalta. He was referred for physical therapy and directed to see a social worker.

At physical therapy sessions in June 2017, [Plaintiff] reported that he had stopped going to aquatic therapy the previous year. He felt that his overall mobility was severely limited by his joint pain, but that he could perform ADLs with increased time to complete them, with pain. He could do recreational walking and he was able

8

to ambulate independently. Also[,] in June 2017, he reported some decrease in his morning stiffness with the new medication, but continued to have some pain. He reported 10/10 migraine pain and 8/10 joint pain. However, upon examination, he was in no acute distress, his gait was normal, strength normal, with no tenderness and no atrophy. He continued to have some tenderness in the bilateral hips and limited range of motion in the cervical and lumbar spine. His joints were otherwise unremarkable. He had some tenderness in the spine area and his strength was fair plus to good overall. He also had some range of motion limitation in his spine. That same month he was noted to have normal muscle tone and strength and normal range of motion in the extremities. He reflexes, sensation, and gait were all normal.

He had daily headache pain behind the eyes in June 2017. He reported these occurred daily with 20 migraines per month that could last hours to days. Eye examinations were clinically insignificant at this time. He was noted to have chronic migraines with a cervicogenic component and mood component in the context of overusing medication. He was directed to reduce medication overuse and headache education was done. There is no medical evidence of record after the summer of 2017.

(R. at 2192-2194 (internal citations omitted).)  ALJ Southern summarized Plaintiff's medical

records and symptoms related to his mental impairments prior to turning age 18 as follows:

[Plaintiff] was also diagnosed with adjustment disorder. In June 2011, he reported supportive friends and no problems with memory, though he had some problems with concentration due to increased pain. In August 2012, he was described as alert, cooperative, and easily engaged. In December 2012, he reported depressive symptoms with a depressed mood, low energy, disrupted sleep, isolation, withdrawal, and feelings of worthlessness, but he denied anxiety symptoms, manic symptoms, psychotic symptoms, obsessions, compulsions, posttraumatic symptoms, inattention symptoms, hyperactivity, impulsivity, oppositional defiant symptoms, and conduct problems. He testified at the January 2013 hearing that he felt depressed due to not feeling like a normal teenager and being worried about the future. Despite this mood disorder, he reported that he had friends at school and no behavior problems at home or school. Moreover, he was not involved in any counseling and did not take any medication. In June, August, October, and December 2013, he was described as alert, active, oriented and appropriate.

(R. at 2176 (internal citations omitted).)

ALJ Southern summarized Plaintiff's medical records and symptoms related to his

mental impairments since turning age 18 as follows:

With respect to [Plaintiff's] mental condition after his 18th birthday, in February and August 2014, [Plaintiff] was alert, active, oriented, and appropriate. He

reported that he had graduated from high school and was overall better. In April 2015, he was described as the primary caregiver for his grandfather, who had passed away the past month, and he reported difficulty finding work since his grandfather's death, which suggests that he was actively seeking work. In August 2015, his mother indicated that professional mental health treatment was being sought. In September 2015, [Plaintiff] expressed his intention to pursue his college dream after he got his pain under control, and he was scheduled for five free sessions of mental health counseling. September and November 2015 reviews of systems revealed no sleep disturbance or behavior changes. In November 2015, he was started on Zoloft for mood elevation, as he reported a low mood but no suicidal ideation. He reportedly had seen a psychologist for only two to three sessions but lost his password and had not returned. In December 2015, he had an appropriate mood, affect, and orientation. In January 2016, he reportedly did not have sleep disturbance or behavior changes. At the February 2016 hearing, he testified that he was single, and he acknowledged that he read, wrote, and understood English. He said that he worked for one and one-half months in 2014 for a car wash but he said that he had to quit due to his medical condition, but he did not indicate a mental-related reason. He said that he occasionally read but had difficulty maintaining focus. He said that he had been a caregiver to his grandfather, who passed away in March 2015, but he said that he struggled to provide care and often had to call his mother from work to help, though that was due to physical, not mental reasons. In March and May 2016, he reportedly did not have sleep disturbance or behavior changes. Upon examination in December 2016, [Plaintiff] was alert, cooperative, and easily engaged. [Plaintiff] exhibited some symptoms of depression during a May 2017 visit with a social worker. He had a sad/depressed demeanor, but reported that he has "never" felt depressed. The social worker indicated there were no concerns for behavior or mental health needs at that time. Upon examination in June 2017, [Plaintiff] was alert and oriented. He had normal recent and remote memory. His attention span and concentration was normal. His thought process and content were unremarkable. He was able to follow commands appropriately. His speech was normal and his fund of knowledge was normal.

(R. at 2194-2195 (internal citations omitted).)

## IV.   ADMINISTRATIVE DECISION

On April 23, 2021, ALJ Southern issued the subject non-disability determination.  (R. at 2162-2210.)  When reviewing Plaintiff's claim under the child SSI standards, ALJ Southern found that prior to attaining age 18, Plaintiff had the following severe impairments: fibromyalgia; ankylosing spondylitis/juvenile arthritis; and an affective disorder within the meaning of 20 C.F.R. §416.924(c).  (R. at 2170.)  ALJ Southern concluded, however, that

10

Plaintiff's childhood impairments were not of a severity that medically met or equaled the severity of any impairments listed in Part B of Appendix 1 to Subpart P, 20 C.F.R. Part 404. (R. at 2171.) ALJ Southern found that prior to attaining age 18, in the six domains used to determine a child's functional equivalence, Plaintiff had "less than marked" limitations in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects and caring for yourself, and that he had a "marked" limitations in area of health and physical well-being. (R. at 2180-2186.) ALJ Southern concluded that because Plaintiff did not have an impairment or combination of impairments that met, medically equaled any listing or functionally equaled the listings, Plaintiff was not disabled prior to attaining age 18. (R. at 2186.)

ALJ Southern also discussed, however, that Plaintiff has had a new severe impairment of a headache disorder since attaining age 18, and ALJ then reviewed Plaintiff's disability claim since he turned 18. (*Id.*) At step one of the sequential evaluation process,[2] ALJ Southern found

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

that Plaintiff has not engaged in substantially gainful activity since August 19, 2011, the application date. (R. at 2170.) ALJ Southern found that since attaining age 18, Plaintiff continued to have a severe impairment or combination of impairments of fibromyalgia; ankylosing spondylitis/juvenile arthritis; and an affective disorder. (R. at 2187.) She further found that since attaining age 18, Plaintiff has not had an impairment or combination of impairments that meets or medically equals one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*)

Before proceeding to step four, ALJ Southern set forth Plaintiff's residual functional capacity ("RFC"), in pertinent part, as follows:

> [Plaintiff] has the residual functional capacity to sedentary work as defined in 20 CFR 416.967(a) except he can occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; occasionally operate foot controls; frequently reach overhead with the bilateral upper extremities; occasionally balance, stoop, kneel, and crouch; never crawl; tolerate no exposure to hazards such as moving machinery, heavy machinery, or unprotected heights; and do no commercial driving. He would need to use a cane, as needed, and he would be off task 30 minutes over the course of day in increments of 3-4 minutes at time. Mentally, he is limited to simple, routine, repetitive tasks; occasional changes and occasional decision making with few detailed instructions, and changes must be well-explained; and must avoid jobs that require conflict resolution or mediation skills.

(R. at 2190.)

At step four, ALJ Southern determined that Plaintiff has no past relevant work. (R. at 2198.) At step five, relying on the VE's testimony, ALJ Southern concluded that since attaining age 18, Plaintiff could perform jobs that exist in significant numbers in the national economy. (R. at 2198-2199.) ALJ Southern therefore concluded that Plaintiff has not been under a disability, as defined in the Social Security Act, since August 11, 2011, the date the application was filed. (R. at 2199.)

## V. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 119 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives [Plaintiff] of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.    ANALYSIS

Plaintiff sets forth two issues in his statement of errors:  (1) that ALJ Southern violated the treating physician rule when evaluating the medical source opinions, for both Plaintiff's childhood and adulthood disability claims; and (2) that the Social Security Administration's structure is unconstitutional as it violates the separation of powers doctrine.  (ECF No. 11.)  The Court will address each argument in turn.

### A.    Treating Physician Rule.

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case.  20 C.F.R. § 416.927(c).  The applicable regulations[3] define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(1).

The ALJ generally gives deference to the opinions of a treating source "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical filings alone . . . ."  20 C.F.R. § 416.927(c)(2); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013); *Blakley*, 581 F.3d at 408.  If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial

---

[3] "Revisions to regulations regarding the evaluation of medical evidence went into effect on March 27, 2017, and purport to apply to the evaluation of opinion evidence for claims filed before March 27, 2017."  *Smith v. Comm'r of Soc. Sec.*, No. 3:18CV622, 2019 WL 764792, at *5 n.2. (N.D. Ohio Feb. 21, 2019) (citing 82 Fed. Reg. 5844-5884 (Jan. 18, 2017)).  Plaintiff's claims here were filed before March 27, 2017, before the new regulations took effect.

evidence in [Plaintiff's] case record, [the ALJ] will give it controlling weight."  20 C.F.R. § 416.927(c)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id*.  Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion."  20 C.F.R. § 416.927(c)(2).  Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted).  The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45.  Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed [Plaintiff] as disabled."  *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

There is no requirement, however, that the ALJ expressly consider each of the *Wilson* factors within the written decision.  *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir. 2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. § 416.927(c)(2) for weighing medical opinion evidence within the written decision).  Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity.  20 C.F.R. § 416.927(d).  Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance.  20 C.F.R. § 416.927(d)(2); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

Against that legal background, Plaintiff submits that ALJ Southern violated the treating physician rule in two ways:  first, in discrediting the opinions of Drs. Heyer and Spencer as to Plaintiff's impairments before he turned 18 years old, and second, in discrediting the opinion of Dr. Spencer regarding Plaintiff's impairments after he turned 18.  (ECF No. 11 at PAGEID ## 2593-2603.)  In response, the Commissioner first argues that Plaintiff is attempting to "tak[e] a second bite of the apple" by relitigating the Court's prior decision denying benefits for Plaintiff's childhood disability claim.  (ECF No. 16 at PAGEID ## 2636-2638.)  The Commissioner argues that because this Court already affirmed a final decision of the Commission with respect to Plaintiff's childhood disability claim, and Plaintiff did not appeal that decision, Plaintiff is precluded from further pursuing his childhood disability claim under the doctrine of collateral estoppel.  (*Id.*)  As for Plaintiff's adulthood disability claim, the Commissioner also argues that ALJ Southern properly evaluated Drs. Spencer and Heyer's opinions, that ALJ Southern provided good reasons for not affording those opinions controlling weight, and that substantial

evidence supports ALJ Southern's analysis.  (*Id.* at PAGEID # 2638-2649.)  Plaintiff did not file a Reply.

As a threshold matter, the Court agrees with the Commissioner that Plaintiff's arguments regarding his childhood disability claim are barred.  As the Commissioner correctly observed, the Undersigned previously determined that "[s]ubstantial evidence supports the ALJ's evaluations and conclusions on the opinion evidence in the record pertaining to the child disability decision." [*Christian D.*] *v. Comm'r of Soc. Sec.*, No. 2:17-cv-995, 2020 WL 240813, at *9-13 (S.D. Ohio Jan. 16, 2020), *adopted in part, rejected in part,* 2020 WL 1305030 (S.D. Ohio Mar. 19, 2020) (the "March 2020 Order").  Of critical import, Plaintiff did ***not*** object to that determination, so the Court previously adopted it as a final judgment on Plaintiff's childhood disability claim.  *Id.* at *6 ("With regard to the first assignment of error—the ALJ improperly evaluated the opinion evidence of record in determining that Plaintiff was not disabled under the **childhood** standard of disability—Plaintiff did not file a timely objection to the Magistrate's R&R recommending that this contention of error be overruled.  Accordingly, as to Plaintiff's first assignment of error the Court ADOPTS the Magistrate Judge's R&R and AFFIRMS the Commissioner's decision.") (emphasis added).  And when the Court did so, Plaintiff was bound by that final judgment and was foreclosed from relitigating it.  42 U.S.C. § 405(g) ("**The judgment of the court shall be final** except that it shall be subject to review in the same manner as a judgment in other civil actions.") (emphasis added).  Accordingly, the Undersigned will not review Plaintiff's first argument – that ALJ Southern violated the treating source physician rule regarding Drs. Heyer and Spencer's opinions as to Plaintiff's impairments before he turned 18 years old – as the Court's prior judgment on that issue is final.

The Undersigned will, however, review Plaintiff's second argument – that ALJ Southern

violated the treating source physician rule regarding Dr. Spencer's opinion as to Plaintiff's

impairments after he turned 18 years old – because that was the subject of the Court's prior

remand. *See* March 2020 Order, 2020 WL 1305030, at *6-8 (Reversing on the basis that the ALJ

"failed to provide good reasons for discrediting Dr. Spencer's opinion" regarding his "adult

disability claim," and remanding "for proceedings consistent with this Opinion.").  But upon

review of Plaintiff's second argument, the Undersigned finds that it is not well taken, as ALJ

Southern provided good reasons for discrediting Dr. Spencer's opinion as to Plaintiff's adult

disability claim.

After Plaintiff turned 18 years old, his treating physician Dr. Spencer completed two

medical source statements – one on July 24, 2015, and one on January 14, 2016.  (R. at 1695-

1700 (July 24, 2015 medical source statement), 1883-1888 (January 14, 2016 medical source

statement).)  ALJ Southern discussed these opinions at significant length:

> As for the opinion evidence, pursuant to the District Court remand order, [Plaintiff]
> has considered the opinion of Dr. Spencer, under the "treating physician rule" and
> the "good reasons rule." The District Court found that the ALJ did not provide
> "good reasons" for failing to give Dr. Spencer's opinion controlling weight and
> that "the lack of explanation and ambiguity in the ALJ's critique hinders
> meaningful review by this Court." Specifically, the District Court found that the
> prior ALJ failed to discuss what specific portions of the treatment record and
> reported activities of living supported discounting Dr. Spencer's opinion that
> [Plaintiff's] condition would likely deteriorate under stress, he would be distracted
> from completing tasks, and he would have excessive absences from work. The
> undersigned has considered the entirety of the record detailed above in assessing
> the weight of the opinions.
>
> A summary of Dr. Spencer's opinions is set out directly below. First, in a medical
> source statement in July 2015, Dr. Spencer opined that [Plaintiff] could rarely lift
> up to 20 pounds and frequently lift up to 10 pounds; frequently reach bilaterally;
> frequently handle with the right hand and occasionally handle with the left hand;
> and frequently finger bilaterally. In an 8-hour workday, he can stand for 4 hours
> total and 45 minutes at a time; walk for 2 hours total and 45 minutes at a time; and
> sit for 5 hours total and 60 minutes at a time. He cannot use his feet for repetitive
> movements/foot controls. He can never climb ladders, occasionally squat and
> climb steps, and frequently bend, crawl, and climb steps slowly. He can reach

above shoulder level. He felt [Plaintiff] would likely have partial or full day unscheduled absences 5 or more days per month. In a more recent medical source statement from January 2016, Dr. Spencer opined that [Plaintiff] can occasionally lift up to 20 pounds and frequently lift up to 10 pounds; and frequently handle and finger bilaterally. In an 8-hour workday, he can stand for 2 hours total and 45 minutes at a time; walk for 2 hours total and 30 minutes at a time; and sit for 4 hours total and 60 minutes at a time. He can use his feet for repetitive movements. He can occasionally bend, crouch, crawl, and climb steps and ladders. He can reach above shoulder level. His condition is likely to deteriorate under stress. He felt [Plaintiff] would likely have partial or full day unscheduled absences less than 5 days per month. Then, Dr. Spencer indicated in a letter dated January 22, 2016, that [Plaintiff] "has improved, but he remains partially disabled[.]" He opined that [Plaintiff]: 1) He has trouble standing for an extended period of time due to his back and other joint pain. 2) He has difficulty walking any distance. 3) He cannot bend over well or frequently. 4) He has joint pain that may be distracting at times doing tasks while sitting and standing. 5) He may miss work days or arrive late at times due to his illness.

**The undersigned gives some weight to the more recent assessment, and little weight to the earlier assessment, of Dr. Spencer, who has a long treating relationship with [Plaintiff]. His later assessment, when he had the experience of having treated [Plaintiff] for a longer period, is more consistent with the above-summarized evidence that documents persistent reports of musculoskeletal tenderness that would be consistent with the RFC above and the limitation to sedentary exertion in particular. However, the statement that [Plaintiff] is "partially disabled" is an opinion on an issue reserved for the Commissioner. The statement that [Plaintiff] has difficulty walking "any" distance is vague and not fully consistent with [Plaintiff's] self-reports that he can mop, vacuum, and walk the dog around the block or his noted intention to go back to work or go back to school or the findings of normal strength and normal gait during examinations detailed above. The limitation to handling and fingering is not supported in the broader record, given the largely unremarkable neurological examinations. Dr. Spencer's opinions are in other ways not limiting enough, as he does not appear to account fully for the headache related environmental limitations or the need to use a cane and be off task, given [Plaintiff's] testimony and his persistent headache symptoms. Accordingly, I cannot give Dr. Spencer's physical opinions controlling weight.**

In a mental medical source statement from July 2015, Dr. Spencer opined that [Plaintiff] had no social interaction limitation; moderate limitation in his ability to perform at production levels expected by employers, but no more than mild impairment in sustained concentration and persistence otherwise; moderately limited ability to remember locations, workday procedures, and instructions and ability to tolerate customary work pressures, but otherwise no more than mild limitation in adaptation. He felt [Plaintiff] would likely have partial or full day unscheduled absences 5 or more days per month, and that his condition was likely

to deteriorate if he is placed under stress. In a more recent mental medical source statement from January 2016, Dr. Spencer opined that [Plaintiff] had no more than mild limitation in social interaction; moderately limited impairment in the ability to perform at production levels expected by employers, but no more than mild impairment in sustained concentration and persistence otherwise; and no limitation in adaptation except for a mildly limited ability to respond appropriately to changes. He felt [Plaintiff] could possibly have partial unscheduled absences 5 or more days per month, and that his condition was likely to deteriorate if he is placed under stress.

**However, the above-summarized treatment record and reported activities of living are not consistent with the alleged intensity of symptoms and limitations to support Dr. Spencer's opinion that [Plaintiff's] condition would likely deteriorate under stress, that he would be distracted from completing tasks, or that he was likely to have excessive absences from work. Dr. Spencer is not a mental health professional and the above-summarized record does not document excessive work absences. The undersigned also notes that the absenteeism and stress limitations are phrased in vague and conditional language such as "could possibly" and "likely" that limits the opinion's value as a functional assessment. More specifically, the undersigned notes [Plaintiff's] own reports that he has "never" felt depressed, his expressed desire to return to work or go to college, and his alert, cooperative, and easily engaged presentation upon examinations. The undersigned also notes his normal attention and concentration during examinations as well as his ability to follow commands appropriately upon examination. All of this is supportive of a much greater ability to tolerate stress, complete tasks, and attend work without absences than opined by Dr. Spencer. For this reason, the treating source medical opinion of Dr. Spencer is not well-supported and is inconsistent with the other substantial evidence in the case record, and thus it has not been given controlling weight. Instead, the undersigned finds that the opinion is somewhat consistent with the broader record, and gives it some weight, but no significant weight.** As noted above, the above-summarized evidence documents some clear limitations related to depression in each of the four mental functional domains and the undersigned notes that [Plaintiff's] headache condition also likely contributes to his difficulty with memory, attention, and energy. [Plaintiff's] testimony also indicated some discomfort when around others. However, examinations also often show normal mental health functioning and during at least one visit, he indicated he "never" felt depressed and the social worker had no concerns for his mental health or behavior. [Plaintiff] also expressed an intention to either return to work or school, which suggests he felt he could function mentally in these settings. Considering all of this, the undersigned finds that he is limited to simple, routine, repetitive tasks; occasional changes and occasional decision making with few detailed instructions, and changes must be well-explained; and must avoid jobs that require conflict resolution or mediation skills.

(R. at 2195-2198 (emphasis added; internal citations omitted).)

Plaintiff argues that with this analysis, ALJ Southern "did not properly abide by the treating physician rule, as she failed to apply the controlling weight test," and that alternatively, "should this Court find that the ALJ did properly apply the controlling weight test, this Court should still reverse the ALJ's decision as the ALJ failed to provide the requisite good reasons for according less than controlling weight to Dr. Spencer's treating source opinions."  (ECF No. 11 at PAGEID # 2602.)  Plaintiff argues that ALJ Southern's "claims of vagueness or a lack of specificity [are] disingenuous," and submits that the evidence "would certainly warrant a basis for absenteeism issues."  (*Id.* at PAGEID ## 2602-2603.)  Plaintiff argues that ALJ Southern "shrugged off the possibility" and that her "willful ignorance led to the improper rejection of valid medical opinions."  (*Id.* at PAGEID # 2603.)  Plaintiff also submits, without much discussion, that "[t]he rest of [ALJ Southern's] 'analysis' of Dr. Spencer's opinions was extremely conclusory."  (*Id.*)

The Undersigned disagrees.  First, the Undersigned rejects Plaintiff's argument that ALJ Southern "failed to apply the controlling weight test," as ALJ Southern clearly articulated why she did not afford Dr. Spencer's opinions controlling weight.  (R. at 2196-2197.)  Specifically, with regard to Dr. Spencer's opinions regarding Plaintiff's physical impairments, ALJ Southern properly concluded that Dr. Spencer's proposed limitations were inconsistent with the substantial evidence of record, both in ways that were too favorable to Plaintiff and in ways that were not favorable enough to Plaintiff.  (R. at 2196.)  For example, ALJ Southern correctly noted that Dr. Spencer's opinion that Plaintiff had difficulty walking "any" distance is plainly inconsistent with Plaintiff's own reports that he can "mop, vacuum, and walk the dog around the block," and is also unsupported by Dr. Spencer's own findings of "normal strength and normal gait" during examinations.  (*Id.*)  ALJ Southern also found that Dr. Spencer's proposed handling and

fingering limitations were not supported by "the largely unremarkable neurological examinations." (*Id.*) At the same time, however, ALJ Southern found that Dr. Spencer's environmental limitations were too strict, as they were again inconsistent with Plaintiff's own testimony and his "persistent headache symptoms." (R. at 2196-2197.) Accordingly, ALJ Southern provided multiple "good reasons" for finding that she could not "give Dr. Spencer's physical opinions controlling weight," and her conclusions were properly supported by substantial evidence. (R. at 2197.)

The same can be said for ALJ Southern's treatment of Dr. Spencer's opinions regarding Plaintiff's mental impairments. As an important preliminary matter, ALJ Southern first noted that "Dr. Spencer is not a mental health professional." (*Id.*) ALJ Southern also noted, however, that Dr. Spencer's opinions were not supported by his own findings, and they were (again) inconsistent with Plaintiff's own reports:

> More specifically, the undersigned notes the claimant's own reports that he has "never" felt depressed, his expressed desire to return to work or go to college, and his alert, cooperative, and easily engaged presentation upon examinations. The undersigned also notes his normal attention and concentration during examinations as well as his ability to follow commands appropriately upon examination.

(*Id.*) Given these irreconcilable inconsistencies, ALJ Southern appropriately concluded that "[a]ll of this is supportive of a much greater ability to tolerate stress, complete tasks, and attend work without absences than opined by Dr. Spencer." (*Id.*) In so finding, ALJ again provided sufficient "good reasons" for concluding that Dr. Spencer's mental impairment opinions were "not well supported and [] inconsistent with the other substantial evidence in the case record, and thus it has not been given controlling weight." (*Id.*) ALJ Southern then reviewed the other record evidence and devised a mental RFC limiting Plaintiff to "simple, routine, repetitive tasks; occasional changes and occasional decision making with few detailed instructions, and changes

must be well-explained; and must avoid jobs that require conflict resolution or mediation skills."

(R. at 2197-2198.) Again, because the Undersigned finds that ALJ Southern's findings were

properly supported by substantial evidence, Plaintiff's first assignment of error is not well taken.

## B.     Separation of Powers.

Plaintiff asserts that remand is required because a statute that provided tenure

protection to the former Commissioner of Social Security Andrew Saul violated the separation of

powers doctrine. (ECF No. 11 at PAGEID ## 2603-2608.) He contends, therefore, that the

decision to deny him benefits was made by individuals who lacked a proper delegation of power

to make a benefits determination. (*Id.*) The Undersigned finds no merit to this argument.

As a preliminary matter, Plaintiff's claim, in the manner he has raised it here, is

procedurally improper. *Butcher v. Comm'r of Soc. Sec.*, No. 2:20-cv-6081, 2021 WL 6033683, at

*6 (S.D. Ohio Dec. 21, 2021); *Crawford v. Comm'r of Soc. Sec.*, No. 2:21-CV-726, 2021 WL

5917130, at *7 (S.D. Ohio Dec. 14, 2021). This is so because Rule 8 of the Federal Rules of

Civil Procedure provides that a Complaint must contain a "short and plain statement of the claim

showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although a Complaint

need not provide "detailed factual allegations," it "requires more than labels and conclusions,

and a formulaic recitation of the elements of a cause of action will not do." *Bell v. Atl. Corp. v.

Twombly*, 550 U.S. 544, 555 (2007). At a minimum, a complaint must "give the defendant fair

notice of what the. . . claim is and the grounds upon which it rests." *Id*. Here, the United States

Supreme Court case upon which Plaintiff bases his Constitutional claim was decided on June 20,

2020. Plaintiff, however, gave no notice, let alone fair notice, of this claim in his Complaint filed

on July 27, 2021. (ECF No. 1.) *Butcher,* 2021 WL 6033683, at *6 (citing *John R. v Comm'r of

Soc. Sec.*, Case No. C20-6176-MLP, 2021 WL 5356719, *7 (W.D. Wash. Nov. 16, 2021) (finding

23

that a plaintiff failed to comply with Rule 8 by failing to plead a separation of powers claim in

complaint seeking judicial review of Commissioner's decision to deny benefits); *Shannon R. v.*

*Comm'r of Soc. Sec.*, Case No. C21-5173, 2021 WL 5371394, at * 6–7 (Nov. 18, 2021) (same)).

For this reason, Plaintiff failed to comply with Rule 8. *Id.*

Beyond this procedural deficiency, Plaintiff's claim also fails on a substantive basis.

Plaintiff, relying on *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183 (2020),

contends that former Social Security Administration Commissioner Andrew Saul's appointment

violated the principle of separation of powers because 42 U.S.C. § 902(a)(3) provides for a six-

year term and makes the Commissioner removable only upon a finding of neglect of duty or

malfeasance in office.  (ECF No. 11 at PAGEID ## 2603-2604.)  Accordingly, Plaintiff argues

that the Commissioner had no authority to carry out any functions of his office and, by extension,

the ALJ had no authority to adjudicate Plaintiff's applications, necessitating a remand.  (*Id.* at

PAGEID ## 2603-2608.)  In response, the Commissioner concedes that § 902(a)(3) violates the

principle of separation of powers.  (ECF No. 16 at PAGEID # 2627 ("The parties agree that 42

U.S.C. § 902(a)(3) violates the separation of powers to the extent it is construed as limiting the

President's authority to remove the Commissioner without cause.").)  The parties' agreement on

this issue, however, is not dispositive.

Plaintiff asserts that because the removal provision is unconstitutional, any delegations of

power by former Commissioner Saul, including delegations of authority to ALJs or the Appeals

Council who determined his benefits claims, were invalid.  (ECF No. 11 at PAGEID # 2604.)

The Commissioner counters, however, that the ALJ who determined Plaintiff's claim on April 23,

2021, held office on that date because of a ratification of delegated authority in July 2018, by

then-Acting Commissioner Nancy Berryhill, not because of a delegation of authority from

24

former Commissioner Saul. (ECF No. 16 at PAGEID #2628 n.3.) As the Commissioner correctly notes, an Acting Commissioner is not subject to § 902(a)(3)'s removal provision thereby making that provision's constitutionality, or lack thereof, irrelevant. *Butcher*, 2021 WL 6033683, at *6 (citing *Collins v. Yellin*, 141 S.Ct. 141 S. Ct. 1761, 1781 (2021) (because the FHFA removal restrictions only applied to the Director, "any constitutional defect in the provisions restricting the removal of a confirmed Director would not have harmed [the plaintiffs], and they would not be entitled to any relief" from actions of the Acting Director who enjoyed no such removal protections); *Thomas E. v. Comm'r of Soc. Sec.*, C21-5107-BAT, 2021 WL 5415241, *5 (W.D. Wash. Nov. 19, 2021) (finding no constitutional injury where ALJ's appointment was ratified by Acting Director Berryhill who, as Acting Director, was not subject to the removal provision in § 902(a)(3)); *Alice T. v. Comm'r of Soc. Sec.*, 8:21CV14, 2021 WL 5302141, *18 (D. Neb. Nov. 15, 2021) (same); *Boger v. Kijakazi*, No. 1:20-cv-00331-KDB, 2021 WL 5023141, * 3 n.4 (W.D.N.C Oct. 28, 2021) ("Plaintiff's constitutional 'removal restriction' argument is likely not even applicable to this case because [the ALJ] was appointed by an Acting Commissioner of Social Security who could be removed from the office at the President's discretion.")).

First, even accepting, as the Commissioner agrees, that the removal provision in § 902(a)(3) is unconstitutional, it would not have deprived former Commissioner Saul of the ability to delegate power to others to decide Plaintiff's benefit claim because of the doctrine of severability. *Butcher,* 2021 WL 6033683, at *7. As the Supreme Court noted in *Seila Law*, "'one section of a statute may be repugnant to the Constitution without rendering the whole act void.'" 140 S.Ct. 2208 (quoting *Loeb v. Columbia Township Trustees*, 179 U.S. 472, 490 (1900)). Indeed, even in the absence of a severability clause, when "'confronting a constitutional flaw in a

statute, [the Supreme Court tries] to limit the solution to the problem, severing any problematic portions while leaving the remainder intact.'" *Id*. (quoting *Free Enterprise Fund v. Public Co. Accounting Oversight Bd*., 561 U.S. 477, 508 (2010)). For that reason, in *Seila Law*, the Supreme Court found that the unconstitutional removal provision was severable from the remainder of the CFPB's governing statutes because the CFPB was capable of functioning independently even if the unconstitutional removal provision was stricken. 140 S.Ct. at 2209–10, 2245. The same is true here. If the removal provision in § 902(a)(3) is stricken, the Social Security Administration would remain fully functional. *Butcher,* 2021 WL 6033683, at *7 (citing *Alice A. v. Comm'r of Soc. Sec.*, Case No. C20-5756, 2021 WL 5514434, *6 (W.D. Wash. Nov. 24, 2021) (finding that plaintiff's separation of powers claim failed, in part, because even if § 902(a)(3) was unconstitutional it was severable from the remainder of the statutes governing the Social Security Administration); *Shaun A. v. Comm'r of Soc. Sec*., Case No. C21-5003-SKV, 2021 WL 5446878, *4 (W.D. Wash. Nov. 22, 2021) (same); *John R. v Comm'r of Soc. Sec*., 2021 WL 5356719, *8 (same)).

Additionally, even assuming the unconstitutionality of the removal provision in § 902(a)(3), that would not have automatically rendered former Commissioner Saul's appointment invalid. For this reason, it would not have automatically invalidated his actions, including delegating authority to make benefits determinations or ratifying such delegations. *Butcher*, 2021 WL 6033683, at *7. In *Collins v. Yellin*, 141 S.Ct. 141 S. Ct. 1761 (2021), decided after *Seila Law*, the Supreme Court considered a statute similar to § 902(a)(3) governing removal of Directors of the Federal Housing Finance Agency ("FHFA"). The *Collins* majority held that "[a]lthough the statute unconstitutionally limited the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of

26

appointment to that office.  As a result, there is no reason to regard any of the actions taken by the FHFA [ ] as void."  *Id.* at 1787 (emphasis in original); *see also id.* at 1788, n.23 ("Settled precedent also confirms that the unlawfulness of [a] removal provision does not strip the Director of the power to undertake the other responsibilities of his office[.]" (citing *Seila Law*, 140 S.Ct. at 2207–2211)).  Instead, to obtain reversal of an agency decision, a plaintiff must demonstrate "compensable harm" flowing from the unconstitutional removal clause.  *Collins, 141* S.Ct.. at 1788–89 (remanding for further proceedings to determine whether compensable harm to Plaintiff occurred due to the President's inability to remove a Director of the Federal Housing Finance Agency except for cause).

Here, as the Commissioner contends, Plaintiff has made no showing of compensable harm.  (ECF No. 16 at PAGEID ## 2629-2631.)  In fact, as courts considering this precise argument have begun to conclude, it is unlikely that he could.  *See Butcher,* 2021 WL 6033683, at *8; *Crawford,* 2021 WL 5917130, at *8 (reaching identical conclusion on similar facts).  As recognized by Justice Kagan in *Collins*, the President's choice of SSA Commissioner has very little impact on the result of any particular ALJ or Appeals Council decision.  *Collins,* 141 S.Ct. at 1802 (Kagan, J. concurring) ("[G]iven the majority's remedial analysis, I doubt the mass of SSA decisions—which would not concern the President at all—would need to be undone . . . . When an agency decision would not capture a President's attention, his removal authority could not make a difference.").  Again, neither appointments nor actions taken by a properly appointed official are nullified by an unconstitutional removal provision.  *Butcher,* 2021 WL 6033683, at *8.

Accordingly, the Undersigned finds that Plaintiff's separation of powers claim lacks merit.[4]  Plaintiff's second assignment of error is therefore not well taken.

## VII.   CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits.  Based on the foregoing, it is therefore **RECOMMENDED** that Plaintiff's Statement of Errors (ECF No. 11) be **OVERRULED** and that the Commissioner's decision be **AFFIRMED.**

## VIII.   PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and

---

[4] Significantly, district courts in this Circuit, including, as noted, this one, have rejected the Constitutional claim raised by Plaintiff and consistently have concluded that the allegedly unconstitutional nature of § 902(a)(3) does not require remand.  *See Butcher,* 2021 WL 6033683; *Crawford,* 2021 WL 5917130*; Miley v. Comm'r of Soc. Sec.,* No. 1:20-CV-2550, 2021 WL 6064754 (N.D. Ohio Dec. 22, 2021); *Wybo v. Kijakazi*., No. 20-518-HRW, 2021 WL 6052423 (E.D. Ky. Dec. 21, 2021).  Courts from other Circuits have held similarly. *See Heidi J. D. v. Comm'r of Soc. Sec.*, No. 2:21-CV-878, 2022 WL 1555108, at *7 (S.D. Ohio May 17, 2022) (citing *Lisa Y. v. Comm'r of Soc. Sec.*, ___ F. Supp. 3d ___, No. C21-5207-BAT, 2021 WL 5177363, at *5 (W.D. Wash. Nov. 8, 2021); *Robinson v. Kijakazi*, No. 1:20-CV-00358-KDB, 2021 WL 4998397, at *3 (W.D.N.C. Oct. 27, 2021); *Alice T. v. Comm'r Soc. Sec.*, No. 8:21CV14, 2021 WL 5302141, at *18 (D. Neb. Nov. 15, 2021); *Standifird v. Comm'r of Soc. Sec.*, No. 20CV1630-GPC(BLM), 2021 WL 5634177, at *3 (S.D. Cal. Dec. 1, 2021)).  The Undersigned agrees with the reasoning set forth in these other cases and reaches the same result.

waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816*,* 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).


<div style="margin-left: 40%;">

/s/ *Elizabeth A. Preston Deavers*
</div>

**DATED:  June 14, 2022**          **ELIZABETH A. PRESTON DEAVERS**
                                   **UNITED STATES MAGISTRATE JUDGE**